## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARIA I. RAFALSKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION No. 10-cv-40060-TSH** |
| ) | |
| **PATRICK R. DONAHOE,** ) | |
| **Postmaster General,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### October 3, 2012

**HILLMAN, J.**

### Background

This is an action alleging gender discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[1]  Plaintiff, Maria I. Rafalski, has sued her former employer, the United States Postal Service ("USPS") alleging she was subjected to unlawful gender discrimination (Count One).[2] Plaintiff contends that management retaliated against her for having complained about her perceived discrimination (Count Two).  Plaintiff also complains that management changed her work schedule and created a

---

[1] This case was originally assigned to Judge Saylor.  On June 7, 2012, I was sworn in as the United States District Court Judge for the District of Massachusetts (Worcester Division).  On June 13, 2012, this matter was reassigned to me for all purposes.

[2] As a preliminary matter, the Plaintiff has sued the Postmaster General of the USPS "in his personal and official capacity," Complaint (Docket No. 1) ¶ 4, but there are no allegations that the Postmaster *personally* had any contact or decision making directed at the Plaintiff.  There are therefore no grounds for the Plaintiff's claims against the Postmaster personally.  As of December 2010, the Postmaster General became Patrick R. Donahoe.  Because all of the Plaintiff's claims relate to the Postmaster in his official capacity, Mr. Donahoe may be substituted for Mr. Potter, who was the Postmaster General at the time of the Plaintiff's employment.

hostile work environment, causing her to suffer panic and anxiety so severe that she was forced to resign (Count Three).   On November 22, 2011, Defendant, Postmaster General Patrick R. Donahoe, filed Defendant's Motion for Summary Judgment (Document No. 27) on all three claims in Plaintiff's Complaint (Document No. 4).   After a hearing on that motion on March 19, 2012, I took the matter under advisement.   For the reasons that follow, Defendant's Motion for Summary Judgment is **<u>GRANTED</u>**.

### <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"In reviewing a grant of summary judgment, this court 'constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in the party's favor.'" *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (citing *Meuser v. Fed. Express Corp*., 564 F.3d 507, 515 (1st Cir. 2009)) (quoting *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002)).  The plaintiff/nonmovant can rely on both contradicted and non-contradicted evidence.   *Sensing,* 575 F.3d at 153.   "Where the record contains inconsistencies 'that favor in some lights the defendants and in others the plaintiff,' as long as the 'plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling.'"  *Id.* (citing *Calero-Cerezo*, 355 F.3d 6, 19 (1st Cir. 2004)).

### Material Facts[3]

Plaintiff began working as a letter carrier in the Gardner, Massachusetts Post Office in 2001 (the "post office").  *Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts (Docket No. 32) ("Pl.'s Facts")* ¶ 1.  Except for a brief period, Plaintiff was a member of the local letter carriers' union during her employment.  *Id.* ¶ 2.  Pam Bourdreau was the Gardner Postmaster, but was on assignment, so John Dowd was the Acting Postmaster, and he supervised William McBride, who supervised Plaintiff and the other letter carriers. *Id.* ¶¶ 2-3.

There were fourteen regular carriers at the Gardner post office, including Plaintiff, each of whom has his/her own route, which (s)he delivered five days a week.  *Id.* ¶ 4.  Each carrier had Sunday off, plus a second, rotating day off, known as a "non-scheduled day off." *Id.*  For example, in week one Carrier *X* would have Saturday off and Carrier *Y* would have Monday off; in week two Carrier *X* would have Monday off and Carrier *Y* would have Tuesday off; in week three Carrier *X* would have Tuesday off and Carrier *Y* would have Wednesday off, *etc*. *Id.*

In addition to the regular carriers, there were three "T-6 carrier technicians." *Id.* ¶ 5.  A T-6 was responsible for filling in for a regular carrier on the regular carrier's non-scheduled day off. *Id.*  A  T-6 would have a different route every day.  *Id.*  Plaintiff's husband, David Rafalski ("Mr. Rafalski"), was a T-6 carrier.  *Id.* ¶ 6.

Every carrier scheduled vacation time by "boxing in" their non-scheduled day off.  *Id.* ¶ 12.  Every six weeks, when a carrier's non-scheduled day off was Friday, and his/her non-

---

[3] The parties dispute the relevant time frame for this Court's inquiry.  Because Plaintiff is a USPS employee, she was required to consult an Equal Employment Opportunity Commission ("EEOC") Counselor within forty-five (45) days of any discriminatory conduct.  29 C.F.R. § 1614.103(a)(1).  Defendant argues that the Plaintiff should therefore be precluded from relying on any facts dating before January 16, 2009 (the plaintiff first consulted with an EEOC counselor on March 2, 2009).  Plaintiff, on the other hand, argues her claim of hostile work environment warrants acceptance of evidence of actions as far back as 2007 because she was subject to a "continuing violation" of her rights.  Erring on the side of abundant caution, the Court will consider all facts as alleged by the Plaintiff, because even considering all her material facts, there simply is not enough evidence of gender discrimination to support her claims.

scheduled day off for the new week was Saturday (*i.e.*, the next day), the carrier could obtain a mini-vacation by "boxing in" Friday and Saturday, thereby getting days off in a row (Thursday through Monday). *Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (Docket No. 28) ("Def.'s Facts")* ¶ 8. Employees with seniority had priority in scheduling vacation time. *Pl.'s Facts* ¶ 15. Every carrier was allowed to use their vacation time in minutes, hours, days or weeks. *Id.* ¶ 8. If there were staffing shortages, management could call in carriers and compel them to work on their non-scheduled days off to work, unless the carrier had "boxed in" the day by reserving vacation days immediately before and after a non-scheduled day off. *Def.'s Facts* ¶ 7.

Plaintiff, Mr. Rafalski, and Jeff Duplacy were assigned the same non-scheduled day off. *Pl.'s Facts* ¶ 6. Duplacy maintained the lowest seniority level of the three. *Id.* ¶¶ 16-17. Plaintiff and Mr. Rafalski sometimes "boxed in" the same non-scheduled days off, but because of the rotating schedule, this could happen no more than once every six weeks. *Id.* ¶ 9. When the Rafalskis "boxed in" their time, they could not be called in to work, only Duplacy could be. *Def.'s Facts* ¶ 7. Subsequently, Duplacy complained about this to management. *Pl.'s* Facts ¶¶ 16-17.

Starting in 2007, Plaintiff experienced scheduling problems when McBride threatened to change her schedule because of coverage problems caused when she and her husband boxed in the same days. Throughout that summer, McBride called her in almost every week on her non-scheduled day off. *Pl.'s Facts* ¶ 7. One week, McBride allowed Mr. Rafalski to cover his wife's shift when she was called in on her non-scheduled day off, but then later charged her with being AWOL (absent without leave) until a coworker defended Plaintiff by supporting her claim to have permission for the switch. *Plaintiff's Affidavit (Docket No. 32-1) ("Pl.'s Aff.")* ¶ 3.

At one point, Plaintiff was required to use two vacation days to "box in," while Duplacy was required to use only one even though they were scheduled exactly the same way. *Pl.'s Facts* ¶ 10. Plaintiff also believed that McBride changed the rules on "boxing in" days off, so that certain carriers could "box in" their non-scheduled days off by taking off just one day or merely the two preceding working hours, while those same rules did not apply to her. *Pl.'s Facts* ¶ 11.

In 2009, Plaintiff was informed that her schedule changed because Duplacy complained about her scheduling of vacation time. *Pl.'s Facts* ¶ 16. Plaintiff was more senior than Duplacy. *Id*. Duplacy volunteered to change his non-scheduled day off instead of Plaintiff having to do so. *Plaintiff's Dep.* 41:23-24 (Docket No. 28-1) ("*Pl.'s Dep.*"). Instead, McBride moved Plaintiff from a rotation with one other carrier (Duplacy) to a rotation that also only had one other carrier (Mr. Gallant). *Id.* 40:23-41:25, 48:18-49:24. Meanwhile other rotations had three routes open. *Pl.'s Aff.* ¶¶ 23-24. Carriers were called in on non-scheduled days primarily when rotations have three open routes. *Id.* During an office meeting, McBride told employees "he was going to break-up the Rafalskis." *Affidavit of Ronald Richard* (Docket No. 32-1, *Exhibit E to Panagiotes Declaration*).

By changing Plaintiff's non-scheduled day off, Duplacy's route remained the only regular route open on that day. By contrast, the other groupings involved three open routes. *Pl.'s Facts* ¶ 20. No male carriers were required to change their schedules to stop them from taking the same days off at the same time as other employees. *Id.* ¶ 13. No male carriers were subjected to a scheduled change to prevent them from taking vacation days at certain times. *Id.* ¶ 24.

After Plaintiff complained to her union about having her non-scheduled day off changed, the union met with management to discuss the issue. *Id.* ¶ 25. The union disagreed with the change and proposed that Duplacy's day off should be changed. *Id.* ¶ 26. Ultimately, Plaintiff's

schedule changed; she believes it was because she was part of a married couple. *Pl.'s Dep.* 41:24-25. The schedule change did not decrease her pay, benefits, opportunity for promotion, responsibility, or title. *Def.'s Facts* ¶ 12. Ultimately, the schedule hurt Plaintiff because it prevented her from taking the same day off with her husband, who also could no longer take time off with her. *Pl.'s Dep.* 53:17-23.

In January 2008, a co-worker filed an administrative complaint for gender discrimination, alleging that she was treated unfairly after having made a scene at work. *Def.'s Facts* ¶ 34. She identified Plaintiff as a similarly situated employee who had another employee at the post office who also had outbursts; yet the coworker noted Plaintiff received better treatment because she was not placed on off-duty status. *Id.* The coworker did not name Plaintiff as a victim. *Id.*

Also during the summer of 2007, Plaintiff's co-worker called her at home during her vacation to let her know that fellow employees were talking about her new forty-hour workweek due to a knee injury. *Plaintiff's Aff.* ¶ 4. Plaintiff felt humiliated and embarrassed that McBride had discussed her private medical information. *Id.* ¶¶ 4, 6.

During late 2008, through an Alternate Route Adjustment Process, union representatives at the local and branch level met with management to address adjustments to most of the routes at the Gardner post office. *Pl.'s Facts* ¶ 25. The Gardner post office lost one and a half routes. *Pl.'s Dep.* 27:17-23. Plaintiff was assigned a new route with roughly the same number of deliveries but significantly more work due to a large increase in the distance for walking and carrying. *Pl.'s Aff.* ¶ 11. She was unhappy and complained to supervisor McBride, but her new route did not change. *Id.* ¶ 12. Nonetheless, even with the increase in distance to cover, Plaintiff could still finish her whole route within an eight-hour shift. *Pl.'s Dep.* 29:7-9. Additionally, most of the

other carrier's routes were given additional deliveries. *Id* 29:13-15. The union agreed to the changes. *Id.* 29:20-22.

Plaintiff called in sick with pneumonia on February 3, 2009. *Id.* 34:8-9. McBride called and accused her of abusing sick time. *Pl.'s Aff.* ¶ 13. McBride demanded Plaintiff submit documentation from her doctor that day, even though it was the first day she called in sick. *Id.* Under the Collective Bargaining Agreement ("CBA"), Plaintiff was only required to submit documentation after three days of illness. *Pl.'s Facts* ¶ 30. Plaintiff complied with McBride's directive, nonetheless, a few days later Dowd demanded she submit a doctor's note that included her diagnosis and prognosis. *Id.* ¶ 31. Dowd also rather loudly informed Mr. Rafalski on the workroom floor that the note lacked a prognosis and diagnosis. *Pl.'s Facts* ¶ 32. The union steward told Plaintiff that she would be receiving a letter of reprimand for abusing sick time. *Pl.'s Dep.* 37:11-12. Dowd later apologized for his demand, recognizing that he had exceeded his authority. *Pl.'s Aff.* ¶ 14. Plaintiff does not know of any male carrier who was asked for documentation in the way that she was asked. *Id.* Further, Plaintiff felt offended by the request and also that McBride harassed her while she was out sick. *Pl.'s Dep.* 40:12-14. Plaintiff remained out of work with pneumonia from February 3 through March 17, 2009. *Pl.'s Facts* ¶ 35. During her sick leave, and effective March 14, 2009, her non-scheduled day off was changed. *Pl.'s Dep.* ¶ 40:17-20; *Pl.'s Aff.* ¶ 16.

On March 18, 2009, Plaintiff had surgery for a bunion on her foot. *Pl.'s Facts* ¶ 35. She then remained out of work through May 15, 2009, to recuperate from surgery. *Id.* She later returned to work on May 18, 2009. *Id.* ¶ 38. Two days later, on May 20, 2009, she informed Dowd that she intended to resign. *Id.* Dowd asked her to put her reasons in writing. *Id.* On May 22, 2009, Plaintiff tendered her resignation. *Id.* Under her union's CBA, she was required to give

two week's notice.  *Id.*  Therefore, she worked through June 5, 2009, the effective resignation date.

Plaintiff believes McBride was upset that she was a woman who challenged his authority. *Pl.'s Dep.* 66:4-10, 71:22-25.  She believes that McBride also treated other women at the office poorly. *Id.* 66:11-19. Plaintiff, however, admits that she never heard McBride or Dowd make derogatory comments about women.  *Id.* 69:5-7.  She thinks McBride liked to force her in on her non-scheduled day off, and that it would frustrate him that her husband would volunteer to go in her place.  *Id.* 69:10-18.

On March 2, 2009, Plaintiff contacted an EEO counselor and complained of harassment and retaliation.  *Pl.'s Facts* ¶ 39.  On April 14, 2009, she filed an administrative claim alleging gender discrimination and retaliation dating back to February 3, 2009.  *Id.* ¶ 40.  After her resignation, Plaintiff amended her administrative complaint to allege that she had been constructively discharged.  *Id.* ¶ 41.  Instead of pursuing the EEOC action, Plaintiff exercised her right to go straight to court.  *Id.* ¶ 42.  As a result, her EEOC complaint was dismissed without any discovery or a hearing.  *Id.*

## Discussion

Plaintiff's Complaint sets forth three counts stemming from alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*.:  Count One (sex discrimination), Count Two (reprisal for engaging in protected activities), and Count Three (hostile and abusive working environment).  Because the evidence, in a light most favorable to the Plaintiff, simply fails to show Defendant's complained-of conduct was *based on her sex*, none of the Plaintiff's claims survive summary judgment.

Under Title VII, an aggrieved federal employee may "file a civil action in a federal district court." *Brown,* 425 U.S. at 832; *see also* 42 U.S.C. § 2000e-16(c).   Before doing so, "the complainant must seek relief in the agency that has allegedly discriminated against [her]." *Brown,* 425 U.S. at 832.   The EEOC sets forth specific procedures for seeking agency relief.   42 U.S.C. § 2000e-16(b).   At the outset of the process, "[a]ggrieved persons . . . must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter." *Id.* § 1614.105(a). That consultation must be initiated "within 45 days of the date of the matter alleged to be discriminatory . . . ." *Id.* § 1614.105(a)(1). If the matter has not been resolved, "the aggrieved person shall be informed in writing by the Counselor, not later than the thirtieth day after contacting the Counselor, of the right to file a discrimination complaint" with the EEOC or the on-site EEO Office.   *Id.* § 1614.105(d).   As was the case here, after an employee has filed a discrimination complaint, she may bring a civil suit in federal court "only if the EEOC dismisses the [discrimination complaint], or if it does not bring civil suit or enter into a conciliation agreement within 180 days of the filing of the [discrimination complaint]." *Franceschi v. U.S. Dep't of Veterans Affairs,* 514 F.3d 81, 85 (1st Cir. 2008) (citing 42 U.S.C. § 2000e-5(f)(1)).

**Discrimination (Count One)**

Plaintiff has no direct evidence of sex discrimination, so her claims are analyzed under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973); see also *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005).   Under the *McDonnell Douglas* analysis, a plaintiff must first establish a prima facie case of gender discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) and the employer took a materially adverse employment action against her.   *See Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).   A defendant may

rebut this presumption of discrimination by articulating a legitimate, non-discriminatory reason for adverse employment action, and producing some credible evidence to support that reason. *Dávila v. Corporación de P.R. para la Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007).   The employer's burden "is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times." *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir. 2007) (awarding summary judgment to defendant where there was nothing "idiosyncratic or questionable" about employer's decision, despite circumstantial evidence of temporal proximity between plaintiff's request for disability accommodation and her rotation to a different position). Finally, a plaintiff may submit evidence to show that the defendant's articulated reason is pretextual.  *Dávila*, 498 F.3d at 16 ("At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [s]he was fired because of her membership in a protected class.").

There is no dispute that the Plaintiff meets the first two prongs of the *McDonnell Douglas* analysis, but the parties dispute whether Defendant took an adverse employment action against her.  *See Bhatti*, 659 F.3d at 70.  Plaintiff claims the Defendant deliberately changed her schedule to restrict the way she could schedule her vacation time with her husband.  Plaintiff alleges that she was more senior than male co-worker Jeff Duplacy who should have had his schedule changed instead of her.  Defendant counters the schedule change was slight and is nowhere near the type of employment action like hiring, firing, failing to promote, *etc.*, that typically amounts to an adverse employment action. Defendant contends it was only the Plaintiff's second day off that changed due to a different rotation.

In support of her argument, Plaintiff cites *Armery v. Potter*, 497 F. Supp. 2d 134, 141-42 (D. Mass. 2007), positing that a schedule change can amount to an adverse employment action. *Armery*, however, does not stand for this proposition, rather, the United States District Court mentioned in passing that a schedule change causing the loss of a two-day weekend "arguably" could rise to the level of an adverse employment action, but the Court cited no law to support this theory and instead cited a case standing for the contrary position. *Id*. (citing *Williams v. Potter*, No. 3:03-cv-1640-CFD, 2007 WL 247716, at *4 (D. Conn. Jan 29, 2007) (holding that change in schedule from working 6:00 a.m. to 2:30 p.m. with Sundays and Mondays off, to working 7:30 a.m. to 4:00 p.m. with Sundays and Tuesdays off did not constitute an adverse employment action)).  The court in *Armery* also clarified that an action must *materially change* the conditions of a plaintiff's employment to rise to the level of an adverse employment action.  *Armery*, 497 F. Supp. 2d at 141.  *See King v. City of Boston*, 71 Mass. App. Ct. 460, 468 (2008) ("adverse employment action" refers "to the effects on working terms, conditions, or privileges that are material"); *Boutin v. Home Depot, U.S.A., Inc.*, 490 F. Supp. 2d 98, 106 (D. Mass. 2007) (an adverse employment action is one that affects "wages, bonuses, benefits or ability to perform [his] duties."  The determination of whether an action is materially adverse "requires a case-by-case inquiry" that is "cast in objective terms." *Armery*, 497 F. Supp. 2d at 143.  *See MacCormack v. Boston Edison Co.*, 423 Mass. 652, 663 (1996) ("subjective feelings of disappointment and disillusionment," without "objective evidence that [a plaintiff] had been disadvantaged in respect to salary, grade, or other objective terms of employment," are insufficient to establish an "adverse employment action"); *Taylor v. Town of Freetown*, 479 F. Supp. 2d 227, 239 (D. Mass. 2007) (shift change from daytime to graveyard shift did not constitute a materially adverse employment action).  As the First Circuit has observed, "[w]ork places are rarely idyllic retreats, and the mere

fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie v. Maine*, 75 F.3d 716, 725 (1ˢᵗ  Cir. 1996).   Thus, "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action. Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit." *Armery*, 497 F. Supp. 2d at 141.  *See also*, *Marerro v. Goya of P.R.*, 304 F.3d 7, 23 (1ˢᵗ Cir. 2002) ("The clear trend of authority is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in some form or substance, *cannot rise* to the level of a materially adverse employment action.") (emphasis added).   In *Marrero*, the First Circuit held that a disadvantageous transfer was insufficient to prove an adverse employment action where the plaintiff's transfer from one department to another in the same company resulted in some minor, likely temporary, changes in her working conditions; it was not enough that the plaintiff felt "stigmatized and punished" by the transfer.  *Id.* at 25.

Here, the schedule change did not decrease the Plaintiff's pay, benefits, opportunity for promotion, responsibility, or title. *Pl.'s Dep.* 53:6-16. The Plaintiff, however, introduces one key fact that allows her mere schedule change to potentially survive summary judgment: the Plaintiff was more senior than co-worker Jeff Duplacy, a male whose schedule did not change.  Plaintiff argues that his schedule should have changed instead of hers.  The parties dispute why his schedule did not change.  This additional fact allows the Plaintiff to surmount— by the slimmest of margins—the hurdle of showing that she suffered an adverse employment action because of her gender.

Having barely met her burden to make out a prima facie case of discrimination, the reins transfer to the Defendant to articulate, not prove, a legitimate and non-discriminatory reason for

the schedule change. *Dávila*, 498 F.3d at 16; *Roman v. Potter*, 604 F.3d 34, 39 (1st Cir. 2010). Defendant insists it changed the Plaintiff's schedule as part of a greater reorganization and consolidation of delivery routes; even the Plaintiff admits as much. *Pl.'s Dep.* 51:17-22; *Def.'s Facts* ¶¶ 9, 19.

Because the Defendant has set forth a nondiscriminatory and objectively reasonable reason for the schedule change, the burden swings back to Plaintiff to submit evidence showing the Defendant's articulated reason is "pretextual." The Court of Appeals for the First Circuit has held "pretext" to mean "more than an unusual act . . . something worse than a [mere] business error," *i.e.*, "deceit used to cover one's tracks." *Ronda-Perez v Banco Bilbao Vizcaya Argentaria-P.R.*, 404 F.3d 42, 45 (1st Cir. 2005). The only evidence the Plaintiff provides to show pretext is the Defendant's alleged desire to "break up the Rafalskis" from "boxing in" their vacation time together.  Essentially, Plaintiff claims she suffered discrimination because she was a *married* woman.

Courts have, however, found actionable scenarios of "gender-plus" discrimination, *i.e.*, where Title VII forbids discrimination against sub-classes of one gender being treated differently than those of the other gender, such as married women or women with pre-school-age children. *See, e.g.*, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S. Ct. 496, 498 (1971) (per curiam) (employer refused to accept employment applications from women with pre-school-age children, but accepted them from men with pre-school-age children); *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1204 (10th Cir. 1997); *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1448 (2d Cir. 1995) (holding that plaintiff's gender-plus-child-care claim was not adequately supported by the evidence because she failed to compare the tenure experience of women who took leaves of absence for child rearing with the tenure experience of men who took similar

leaves of absence); *Bryant v. Int'l Schs. Servs., Inc.*, 675 F.2d 562, 575 (3d Cir. 1982) ("No evidence was before the trial court to show that married males, in circumstances similar to [married females], received better, or even different treatment.").   The weakness of Plaintiff's gender-plus claim is that she lacks evidence that the Defendant changed her schedule *due to her sex*.   As the First Circuit noted when analyzing "gender-plus" claims of discrimination:

> Ultimately, regardless of the label given to the claim, the simple question posed by sex discrimination suits is whether the employer took an adverse employment action *at least in part* because of an employee's sex.  *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.").

*Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 43-44 (1st Cir. 2009).   None of the other carriers at the Gardner post office are married to each other, so the subclass this Court examines includes only the Plaintiff and her husband.   The change to Plaintiff's non-scheduled day off affected Plaintiff's husband as much as it affected her because he too was no longer able to "box in" vacation time on the same days as his spouse.

Regardless, Plaintiff's evidence of pretext fails.   As the First Circuit has indicated, the *McDonnell Douglas* analysis leaves the burden of persuasion at all times with the plaintiff, and the employer's burden to "articulate" a legitimate, nondiscriminatory reason is not a burden to persuade the trier of fact that he was in fact motivated by that reason and not by a discriminatory one.   Rather it is a burden of production—*i.e.*, a burden to *articulate or state* a valid reason, following which the complainant must show that the reason so articulated or stated is a mere pretext or "cover-up" for what was in truth a discriminatory purpose.  *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011-12 (1st Cir.1979).  *Cf. Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534-35 (1st Cir. 2002) (affirming summary judgment against plaintiff where she produced no evidence of discriminatory animus by supervisors and she had undisputedly violated company rules).   Plaintiff

has simply failed to meet her burden of persuasion.  Absent evidence rebutting Defendant's legitimate, non-discriminatory reason for its action, summary judgment is appropriate.  Plaintiff's discrimination claim cannot, as a matter of law, survive the Defendant's summary judgment argument.

### Retaliation (Count Two)

The Supreme Court has not decided whether federal employees can make retaliation claims under Title VII.  The Court has alluded to, but not resolved, arguments that 42 U.S.C. § 2000e-16 lacks an anti-retaliation provision.  *Compare Gomez-Perez v. Potter*, 553 U.S. 474, 128 S. Ct. 1931, 1941 & n.4 (2008) (casting doubt on, but not deciding, whether federal employees can make retaliation claims under Title VII), *with Morales-Vallellanes v. Potter*, 605 F.3d 27, 35-36 (1st Cir. 2010) (assuming, without deciding, that Title VII retaliation claims by federal employees are actionable).  This Court will assume such a cause of action is available to this Plaintiff, because even if the Court follows the precedent established by the *Morales-Vallellanes* court, Plaintiff's evidence of retaliation is so scant that her claims fail as a matter of law.

Title VII makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 2000e-3(a).  In order to establish a prima facie claim of retaliation under Title VII, a plaintiff must make a showing: (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action.  *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).

Plaintiff's Memorandum of Law in Opposition to Summary Judgment skips any discussion regarding her retaliation claim.  Moreover, with regards to any evidence that

substantiates her claim of engaging in protected conduct, Plaintiff testified to the following at her

deposition:

> Q:   Did you ever complain to anyone in management prior to April 14th, 2009, that you were being sexually harassed?
> A:   I called Pam [Boudreau] and talked to Pam about it.
> Q:   Did you tell her you were being sexually harassed?
> A:   I singled it out to marriage.
> Q:   Okay.  So, you told Pam Boudreau that you felt you were being discriminated against based on your marital status.
> A:   Yes.
> Q:   Okay.  Did you ever tell anyone in management that you felt you were being discriminated based on your gender, separate from marital status?
> A:   I don't recall.
> Q:   Did you ever complain to anyone in management that you felt you were being harassed because of your gender?
> A:   I don't recall specifics.  I can't—I imagine it wouldn't have come up with Bill [McBride], but I don't know.  I can't—I don't know.

*Pl.'s Dep.* 81:1-19.

Title VII does not recognize marital status harassment as a protected activity.  Unless the

opposed conduct falls within the protection of Title VII, a plaintiff claim's for retaliation cannot

survive summary judgment.  *Balazs v. Liebenthal*, 32 F.3d 151, 159-60 (4th Cir. 1994) (the

plaintiff's EEOC claim related to a false rumor circulated at work; summary judgment warranted

on retaliation claim because EEOC had no jurisdiction over rumor claim); *Learned v. Bellevue*,

860 F.2d 928, 32 (9th Cir. 1988) (retaliation claim rejected where the employee's first EEOC

claim was based on claim for a workplace injury and therefore not subject to protection of Title

VII).  Moreover, the phone call happened in March 2009 *after* any of the other incidents of which

the Plaintiff complains, *e.g.*, being asked for a doctor's note, for the doctor's "diagnosis and

prognosis," the change to her non-scheduled day off, *etc*.[4]  Because Plaintiff lacks evidence

---

[4]  Moreover, these incidents are neither sexual in nature nor subject to Title VII protection.  *See* 42 U.S.C. § 2000e-2(m).

showing she engaged in protected activity that led to retaliation, her claim for retaliation must fail as a matter of law.  *Soileau,* 105 F.3d at 16.

**Hostile Work Environment (Count Three)**

Plaintiff alleges that she was subjected to an ongoing hostile work environment due to sexual harassment because, over several years, her supervisor William McBride screamed in her face, yelled at her, falsely accused her of abusing sick leave and being absent without leave, and abused his authority by forcing her to work on her days off and requesting doctor's notes. Plaintiff contends the proverbial "final straw" came when she alleged she was singled out for a schedule change.  Alternatively, Defendant claims most of Plaintiff's facts are time-barred, and/or that they fail to implicate conduct that was either objectively offensive or based on Plaintiff's gender.  Out of an abundance of caution, and in recognition of the "continuing violation" rule that may possibly extend the time of the relevant inquiry regarding Plaintiff's claims, this Court will view all of the Plaintiff's facts and arguments, without deciding whether some are time-barred, to analyze her claim of hostile work environment.

To succeed on a hostile work environment claim, the Plaintiff must show:  (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that she in fact did perceive it as so; and (6) that some basis for employer liability has been demonstrated.  *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 27 (1st Cir. 2011).   Because the hostile workplace inquiry is fact specific, the determination is often reserved for a fact finder, *see Marrero v. Goya of P.R. Inc.*, 304 F3d 7, 19

(1st Cir. 2002), "but summary judgment is an appropriate vehicle for polic[ing] the baseline for hostile environment claims." *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).   To be actionable, the workplace harassment must be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir. 2000).   "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, considering the totality of the circumstances in each case.   *Meritor Sav. Bank, RSB v. Vinson*, 477 U.S. 57, 69, 106 S. Ct. 2399 (1986).   Moreover, the "sexually objectionable environment must be . . . one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.

The question of whether the environment is objectively "hostile or abusive" must be answered by reference to "all the circumstances" . . . including . . . "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 371 (1993). The "accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment." *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 40 (1st Cir. 2011) (citing *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)).   Hostile work environment claims do not "turn on single acts but on an aggregation of hostile acts extending over a period of time." *Havercombe v. Dep't of Educ.*, 250 F.3d 1, 6 (1st Cir. 2001); *see, e.g., White v. N.H. Dep't of Corr.*, 221 F.3d 254,

260-61 (1st Cir. 2001) (affirming a jury finding of hostile work environment where, among other things, "disgusting comments" and conversations occurred "everyday").

As the First Circuit has explained, considerations of severity, frequency, and offensiveness are relevant to a hostile work environment claim. *Tuli*, 656 F.3d at 41.  In *Tuli*, the First Circuit affirmed a jury decision favorable to a plaintiff after she suffered harassment at the hands of male co-workers and superiors over the course of five years.  *Id.* at 47.  In particular, she was ignored at conferences by her male coworkers, asked to dance on a table, a co-worker  attached a picture of her face to a blow-up doll, she was called "a little girl," her surgical skills were demeaned based on her gender, residents ignored her and did not show up for their clinical duties when she was in charge, her boss approved a party planned with "strippers, cages and beer kegs," she was the subject of repeated sexual overtures, and she suffered unwanted physical touching.  *Id.* at 39-40. Conversely, the First Circuit has held that certain types of conduct that was less egregious than the conduct exhibited in *Tuli* was insufficient as a matter of law to sustain a hostile workplace cause of action.  *See, e.g.*, *Pomales v. Celulares Telefonica*, 447 F.3d 79, 83 (1st Cir. 2006) (summary judgment awarded to employer because employee's claim was merely based on one comment and gesture suggesting wish to have sexual relations); *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 56 (1st Cir. 2000) (affirming summary judgment for employer even though it had made three age-related comments to the employee); *Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 192-93 (1st Cir. 1990) (affirming summary judgment for employer where employee was subject to two incidents with sexual innuendo and one request to dance at a Christmas party).

In the present case, Plaintiff meets the first element of a hostile workplace claim, *i.e.*, as a woman she is a member of a protected class. She fails, however, to meet the second and most important element, *i.e.*, being subjected to unwelcome *sexual* harassment. In *Pérez-Cordero*, the

First Circuit vacated a summary judgment for an employer-defendant, but the court implied that at least some of the evidence establishing gender-based animus must be sexual in nature. *See* 656 F.3d at 28. While it is still possible to find sexual harassment even where there is no propositioning, offensive touching, or sexual innuendo, *see Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008), some of the hostile acts must have been motivated by gender bias and discrimination to survive summary judgment. *See Setterlund v. Potter*, No. 05-40194-FDS, 2009 WL 3298095 at *8-9 (D. Mass. Aug. 7, 2009) (noting that plaintiff, a female USPS letter carrier, was subjected to a barrage of "sexually derogatory statements" by male co-workers for a period of years).

Simply put, the most a reasonable jury could find about Plaintiff's work environment is that the following occurred over a two year period: (1) Plaintiff was sometimes required to come in on her nonscheduled days off, as permitted by the terms of her employment; (2) in or around December 2008, management increased the delivery routes of almost all the letter carriers, including the Plaintiff; (3) management once threatened to charge the Plaintiff with being AWOL, but then did not do so; (4) on one date, the Plaintiff was required to use two vacation days when she wanted to use only one; (5) a supervisor once told some of the Plaintiff's coworkers that she had suffered a knee injury; (6) in February 2009, a supervisor asked the Plaintiff for a doctor's note even though she had not yet been absent for three days because he suspected her of abusing sick leave; (7) in February 2009, a supervisor asked the Plaintiff for her "diagnosis and prognosis" because the doctor's notes did not contain the information he thought was required, and then he apologized to the Plaintiff after learning that his request had upset her; (8) Plaintiff's weekly nonscheduled day off was changed from one rotation to another, while the rotation of a less-senior male stayed the same; (9) a supervisor once yelled at the Plaintiff to get off her cell

phone while she was working. Based on the Plaintiff's facts, no reasonable juror could find the workplace to be *sexually* hostile or abusive to the Plaintiff as a matter of law. *Faragher*, 524 U.S. at 787.

Moreover, although the occasional shouting matches with her supervisor may have created an "unpleasant" environment for the Plaintiff, such outbursts were not so severe and pervasive as to be actionable. *See Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 192-93 (1st Cir. 1990) (affirming district court summary judgment finding that conduct was not sufficiently severe or pervasive where, over a two-week period, a co-worker stood behind the plaintiff to create physical contact, surreptitiously looked at the plaintiff's genitals in the restroom, and engaged in unwanted touching); *Lucenti v. Potter*, 432 F. Supp. 2d 347, 361 (S.D.N.Y. 2006) (federal courts will become courts of personnel appeals unless personnel decisions lacking a linkage to sex, race, ethnicity, or handicap are weeded out). "Toiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome, but Title VII does not protect employees from the ordinary slings and arrows that suffuse the workplace every day." *Ahern v. Shinseki*, 629 F.3d 49, 59 (1st Cir. 2010) (internal quotations omitted).

### Constructive Discharge[5]

To discern whether a constructive discharge occurred, a court must assess the working conditions to determine whether they were "so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." *Suarez,* 229 F.3d at 54. "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely

---

[5] Plaintiff's Complaint makes a passing reference at being "forced to resign" from her employment with USPS. Neither party, however, in their motions for and against summary judgment addressed this issue, thus, the Court finds that no Constructive Discharge claim exists.

encounter in a hard, cold world." *Id.* The standard is objective, regardless of an employee's *subjective* beliefs. *Roman v. Potter*, 604 F.3d 34, 42 (1st Cir. 2010).

It is more than a mere reduction in responsibility or a change in the way business is done to substantiate a constructive discharge claim; rather, such changes must also include a diminution in salary or some other marked lessening of the quality of working conditions to be actionable. *Caputo v. City of Haverhill*, No. 02-1746, 2003 WL 21382274, at *1 (1st Cir. 2003) (noting that the plaintiff's salary actually increased). "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Marrero*, 304 F.3d at 28 (citation omitted). In *Marrero*, the First Circuit held there was enough evidence for a jury to find constructive discharge where the plaintiff suffered a long history of hostility, and after repeated complaints her transfer did nothing to ameliorate her condition and in fact worsened the harassment she suffered. *Id.* at 28-29. Marrero had a reasonable belief that her working conditions would not change and that she could only anticipate more of the same "intolerable harassment." *Id.* Plaintiff's claims fall well short of this standard. Nothing Plaintiff alleged was so onerous or unpleasant to have compelled her to resign.

Taking an objective view of the facts in the light most favorable to Plaintiff, she still retained the same duties, title, and opportunity for promotion. The gravamen of Plaintiff's Complaint is that she would no longer be able to share her rotating day off with her husband. After the schedule change, both Plaintiff and her husband still had every Sunday off work. An objectively reasonable increase in work requirements will not support a constructive discharge claim. *See Greenberg v. Union Camp Corp.*, 48 F.3d 22, 27-28 (1st Cir. 1995) (holding that requiring an employee to spend two additional days a week making sales calls was insufficient to

support a claim of constructive discharge); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 135-36 (7th Cir. 1993) (holding that a mere change in job responsibilities without a concomitant loss of salary or benefits was not an adverse employment action).

Ultimately, Plaintiff's claims are about plain vanilla problems at work that should be addressed under the CBA, not by me.  Nothing Plaintiff alleges rises to the level of conduct protected by Title VII.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 27) is **GRANTED**.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**U.S. DISTRICT COURT JUDGE**